UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CLIFFORD W. HOLDER,                              )
                                                 )
                      Plaintiff,                 )
                                                 )
             vs.                                 )        No. 1:14-cv-00134-JMS-MJD
                                                 )
HONDA MANUFACTURING OF INDIANA                   )
LLC,                                             )
                                                 )
                      Defendant.                 )

## ORDER

Presently pending before the Court is Defendant Honda Manufacturing of Indiana LLC's

("HMIN") Motion for Summary Judgment.  [Filing No. 45.]  HMIN contends that it is entitled to

summary judgment on Plaintiff Clifford Holder's hostile work environment claims.  Mr. Holder

opposes HMIN's motion, [Filing No. 49], and HMIN asks the Court to strike some of the evidence

that Mr. Holder designated with his response, [Filing No. 59].  For the reasons explained herein,

the Court grants summary judgment in favor of HMIN, [Filing No. 45], and denies its Motion to

Strike as moot, [Filing No. 59].

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

asserted fact by citing to particular parts of the record, including depositions, documents, or

affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the

materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P.

56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.   Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The following facts are primarily undisputed, but all reasonable inferences have been made in favor of Mr. Holder, the non-movant, consistent with the standard of review on summary judgment.

Mr. Holder, an African American male, worked at HMIN from April 2008 until January 3, 2014.  [Filing No. 45-1 at 6; Filing No. 45-1 at 13; Filing No. 1 at 2.]  He was on an approved leave of absence from April 10, 2013, to July 7, 2013.  [Filing No. 45-2 at 3.]  He began as a process associate, was promoted to a team coordinator in April 2009, and became a team manager in July 2011.  [Filing No. 45-1 at 15-19.]  In February 2012, Mr. Holder was encouraged to apply for a position in the associate relations ("AR") department.  [Filing No. 45-1 at 27-28.]  He did so, and became an AR associate that same month.  [Filing No. 45-1 at 29.]

Mr. Holder was one of four AR associates.  [Filing No. 45-1 at 30.]  He was supervised by Shawntea Stille-Jackson from February 2012 until June 2013 and by Brenda Fortkamp from July 2013 to January 2014.  [Filing No. 45-1 at 35-36; Filing No. 45-2 at 2; Filing No. 45-3 at 2.]  Mr. Holder had no complaints regarding how he was treated by Ms. Stille-Jackson or his co-workers in the AR department.  [Filing No. 45-1 at 36-37.]  Mr. Holder thought he was "treated differently" by Ms. Fortkamp, but he could not say that it was because of his race.  [Filing No. 45-1 at 208.]

As an AR associate, Mr. Holder's duties included "investigat[ing] complaints of wrongdoings or harassment, to give briefings on the policies – in orientation, to be a voice on the floor as far as just out talking to associates and team managers . . . to see what issues or concerns they may have and bringing that back and reporting it to the appropriate people, just anything that we were asked to do." [Filing No. 45-1 at 29.]  Mr. Holder spent approximately seventy percent of his time on investigations.  [Filing No. 45-1 at 41.]  He would conduct an investigation of alleged inappropriate conduct and review how previous incidents were handled to compile a consistency report.  [Filing No. 45-1 at 48-49.]

### A.  Offensive Graffiti

In late 2012, HMIN noticed that graffiti was becoming more prevalent at its plant. [Filing No. 45-2 at 3.]  Some of the graffiti contained offensive language directed at black HMIN employees, some of which threatened physical harm.  [Filing No. 45-1 at 60.]  Mr. Holder heard about the graffiti and "took it on [him]self to go look it up to see what was out there."  [Filing No. 45-1 at 64.]  Mr. Holder had access to the graffiti files through his role as an AR associate, although he had not been specifically asked to look at them.  [Filing No. 45-1 at 64.]  Mr. Holder spoke to Ms. Stille-Jackson, who was investigating the graffiti, and told her that it was "unacceptable." [Filing No. 45-1 at 56-57.]  Ms. Stille-Jackson asked Mr. Holder if he would like to help with the investigation, and Mr. Holder told her that he would do his best to try to find out who was responsible for the offensive graffiti.  [Filing No. 45-1 at 56-58.]

The offensive graffiti at issue was primarily found in a men's bathroom at HMIN, and a process was put into place to monitor the bathroom stalls every 30 minutes to check for graffiti. [Filing No. 45-1 at 83; Filing No. 45-2 at 3.]  HMIN security would take pictures of any graffiti found, [Filing No. 45-1 at 78], the AR team would document it, [Filing No. 45-2 at 3], and it would

4

be removed by HMIN's janitorial service after being documented, [Filing No. 45-2 at 4]. At one point a camera was installed outside the bathroom where the graffiti was most prevalent, but some HMIN associates found it and it was removed. [Filing No. 45-1 at 84-85.]

Mr. Holder later recommended that another camera be installed on a water fountain near one of the bathrooms to provide a view of people entering and exiting the bathroom. [Filing No. 45-1 at 88.] Ms. Stille-Jackson and the head of security agreed that was worth trying. [Filing No. 45-1 at 89-90.] A facilities manager was in charge of installing the camera, but it did not happen before Mr. Holder went on leave several weeks later. [Filing No. 45-1 at 90-91.] Mr. Holder never found out whether the camera was installed, but he does not believe it was. [Filing No. 45-1 at 91-92.]

On April 4, 2013, an HMIN associate approached Mr. Holder with his concerns about the offensive graffiti. [Filing No. 45-1 at 107-108; Filing No. 45-1 at 224.] Mr. Holder told the associate that "[HMIN] was doing everything possible to cease the graffiti." [Filing No. 45-1 at 224.] Mr. Holder testified at his deposition "[t]hat was not an accurate assessment of [his] feelings," he did not "feel that it was [his] place to bad mouth [HMIN] to an employee." [Filing No. 45-1 at 108-09.]

Most of the instances of offensive graffiti occurred prior to Mr. Holder's approved leave in April 2013. [Filing No. 45-1 at 60.] One incident occurred in October 2013 after he returned from his leave, and fellow AR associate Bethany Fellows asked Mr. Holder to help her investigate. [Filing No. 45-1 at 60.] Mr. Holder told Ms. Fellows, "I don't want to be involved." [Filing No. 45-1 at 60.] Mr. Holder never told Ms. Stille-Jackson, Ms. Fortkamp, or anyone in management that he was uncomfortable being involved in the graffiti investigation or that he no longer wanted to be involved. [Filing No. 45-1 at 63; Filing No. 45-1 at 73.]

Mr. Holder never personally found any of the graffiti.  [Filing No. 45-1 at 80-81.]  No

witnesses to the graffiti were ever located, [Filing No. 45-1 at 88], and HMIN never discovered

the source of the graffiti.  [Filing No. 45-2 at 3.]  No additional instances of graffiti occurred after

October 2013 and before Mr. Holder's employment with HMIN ended on January 3, 2014, [Filing

No. 45-1 at 6; Filing No. 45-3 at 3].

## B.  Treatment of Other Associates

In his Complaint, Mr. Holder cites eight instances where he alleges that he was "exposed

to discriminatory decisions by management."[1]   [Filing No. 1 at 3-4.]  All of those instances

involved HMIN employees other than Mr. Holder, but Mr. Holder alleges that they resulted in a

hostile work environment for him and is pursuing that claim under a theory of second-hand

harassment.  [Filing No. 1 at 3-4; Filing No. 44 at 2.]  Mr. Holder summarizes the allegedly

"disturbing pattern" of discriminatory treatment as follows:

> One white employee was promoted over an African American employee who was
> ineligible for the position.  Several white employees were treated differently than
> an African American employee who were all accused of harassment.  One African
> American employee was demoted despite performing her job expectations and
> similar situated employees being treated differently.  Several employees who made
> racial slurs who should have been terminated were not.

[Filing No. 49 at 12.]

Mr. Holder admits that he did not personally witness any of these situations.  [Filing No.

45-1 at 150-51.]  Mr. Holder was involved with the investigation of two of the situations in his

role as an AR associate, but not the others.  [Filing No. 45-1 at 151.]  He admits that he looked at

---

[1] Mr. Holder cites two additional instances where he claims HMIN discriminated against minorities by failing to recruit or promote them.  [Filing No. 1 at 4.]  As HMIN points out in its summary judgment motion, however, Mr. Holder abandoned those allegations during his deposition, and the Court agrees.  Those two instances will not be considered.  [Filing No. 46 at 8 (citing Filing No. 45-1 at 200-01).]

some of the files because he was curious to see what happened. [Filing No. 45-1 at 23; Filing No. 45-1 at 128 ("I looked into the files later, yes, ma'am . . . . Just curious to see how it was handled."); Filing No. 45-1 at 136-137; Filing No. 45-1 at 291 (Q: "That was part of your job? A. In that case [I] was curious. I wanted to see if that issue was an actual fact or was it something that – or was it a rumor.").]

### C. Procedural History

Mr. Holder filed a Complaint against HMIN with this Court on June 30, 2014. [Filing No. 1.] Mr. Holder alleges that he was subjected to a hostile work environment because of his race during his employment with HMIN. [Filing No. 1 at 4.]

On January 9, 2015, Mr. Holder filed a Statement of Claims pursuant to the Case Management Plan. [Filing No. 40; Filing No. 44.] Mr. Holder set forth three bases for his hostile work environment claim against HMIN. [Filing No. 44 at 1.] First, Mr. Holder is pursuing a hostile work environment claim based on the racially offensive graffiti that appeared in the men's bathroom at HMIN. [Filing No. 44 at 1.] Second, Mr. Holder is pursuing a hostile work environment claim based on "the differential and unconscionable treatment of employees of African American de[s]cent." [Filing No. 44 at 2.] Third, Mr. Holder alleges that "a combination of the graffiti and the differential and unconscionable treatment" resulted in a hostile work environment for him. [Filing No. 44 at 2.]

HMIN has moved for summary judgment on Mr. Holder's claims. [Filing No. 59.] That motion is now fully briefed, [Filing No. 49; Filing No. 58], as is HMIN's Motion to Strike certain evidence Mr. Holder submitted in support of his opposition to summary judgment, [Filing No. 59; Filing No. 63].

**III.**
**DISCUSSION**

HMIN contends that it is entitled to summary judgment on all of Mr. Holder's claims in this action.  [Filing No. 45.]  Mr. Holder opposes HMIN's motion in all respects.  [Filing No. 49.] The parties separately address Mr. Holder's hostile work environment claim based on the offensive graffiti and his claim based on the allegedly disparate treatment of employees other than Mr. Holder.  The Court will do the same, after setting forth the generally applicable law regarding hostile work environment claims.

**A.  Applicable Law**

Title VII "makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race....'" *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (quoting 42 U.S.C. § 2000e-2(a)(1)).  This prohibits, among other things, "creation of a hostile work environment." *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014).  To prevail on such a claim, a "plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Id.*

"To survive summary judgment on a hostile work environment claim against an employer under this provision, the employee must show: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Smith*, 388 F.3d at 566.

In evaluating the severity and pervasiveness of the conduct, the Court examines all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is

8

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* (citing *Russell v. Bd. of Trustees of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001)). The plaintiff must show that the work environment was both subjectively and objectively offensive or, in other words, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith,* 388 F.3d at 566. "[T]he workplace that is actionable is the one that is hellish." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (citations and quotation marks omitted). Occasional inappropriate comments do not rise to the level of an objectively hostile work environment. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009).

An employer may be liable if a supervisor is responsible for the harassment. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). If the harassment at issue is from an employee's co-workers, the employer may be liable if it was negligent in preventing or responding to the harassment. *Id.*; *Chaib*, 744 F.3d at 985. Even if the incidents at issue were severe or pervasive enough to rise to an actionable level, an employer that responds reasonably to the occasions of which it is aware is not liable. *Cooper-Schut*, 361 F.3d at 426. Likewise, a reasonable jury cannot find an employer's response that successfully eliminates the harassment to be negligent. *Chaib*, 744 F.3d at 986.

## B. Graffiti

HMIN moves for summary judgment on Mr. Holder's hostile work environment claim based on the offensive graffiti at the HMIN plant. [Filing No. 46 at 15-21.] HMIN contends that the graffiti did not alter the terms of Mr. Holder's employment since it was his job to investigate it, the graffiti was not severe or pervasive, and there is no basis for HMIN's liability because HMIN responded reasonably and the graffiti ultimately stopped. [Filing No. 46 at 15-21.] In making its

first two arguments, HMIN emphasizes that Mr. Holder accessed the graffiti files before being asked to be on the investigation team, he never discovered subsequent graffiti on his own but only reviewed it after the fact in his role as an AR associate, and the graffiti appeared for less than a year. [Filing No. 46 at 15-19.] In arguing that there is no basis for employer liability, HMIN emphasizes what it believes was its reasonable response to the offensive graffiti and argues that Mr. Holder never gave HMIN "any opportunity to remedy the situation *as to him*." [Filing No. 46 at 21 (emphasis in original).] HMIN points to Mr. Holder's testimony that he never told anyone he objected to his assignment on the graffiti investigation team or indicated that he wanted to be reassigned. [Filing No. 46 at 21.]

In response, Mr. Holder emphasizes the physically threatening nature of some of the graffiti and that it was directed at all African American HMIN employees, which includes Mr. Holder. [Filing No. 49 at 8-9.] He contends that this evidence is enough to survive summary judgment regarding whether the harassment was severe or pervasive so as to alter the conditions of his work environment by creating a hostile or abusive situation. [Filing No. 49 at 8-10.] As for HMIN's liability, Mr. Holder disputes HMIN's characterization of its response to the graffiti as reasonable, emphasizing that there is no evidence that the second camera he recommended was ever installed. [Filing No. 49 at 10-11.] Mr. Holder does not dispute that he never objected to his assignment or indicated that he wanted to be reassigned, but he claims that HMIN can still be liable because he "does not claim vicarious liability for acts of supervisors." [Filing No. 49 at 10-11.]

In its reply, HMIN reasserts various arguments it previously presented in its request for summary judgment on Mr. Holder's hostile work environment claim based on the offensive graffiti. [Filing No. 58 at 10-15.] Additionally, it points out that the graffiti did not specifically identify Mr. Holder, that he was aware of it only because of his position with the AR department,

and that the terms and conditions of his employment were not altered based on his assignment to the graffiti investigation team.  [Filing No. 58 at 11-13.]  HMIN again disputes that Mr. Holder has established a basis for employer liability, emphasizing that the law does not impose strict liability in this context and that there "must be a basis for holding the employer at fault." [Filing No. 58 at 13-14.]  HMIN contends that by conceding that no supervisors were involved, Mr. Holder has the burden of showing that HMIN was negligent in failing to rectify the harassment.  [Filing No. 58 at 14.]  To that point, HMIN emphasizes that its remedial actions ultimately worked and, thus, were a reasonable response.  [Filing No. 58 at 14.]

Construing the evidence of record in a light most favorable to Mr. Holder as it must do since he is the non-movant on summary judgment, the Court finds that an issue of material fact exists regarding whether the deplorable graffiti at the HMIN plant was so severe or pervasive as to alter the terms and conditions of Mr. Holder's work environment.  The graffiti began in late 2012 and the last of the approximately fourteen incidents of record occurred in October 2013. [Filing No. 45-2 at 3; Filing No. 45-1 at 6; Filing No. 45-3 at 3.]  The graffiti was typically profane and frequently threatened to violently harm African American HMIN employees.  [*See, e.g.*, Filing No. 50-4 at 2 ("On Friday I am coming in to shoot every n***** I see."); Filing No. 50-4 at 2 ("3 days until all n*****s Die."); Filing No. 50-5 at 2 ("Honda KKK is here all N*****s live in fear"); Filing No. 50-5 at 3 ("Tomorrow All n*****s DIE") ; Filing No. 50-6 at 3 ("Who wants to hang some n*****s").][2]  These violent threats distinguish Mr. Holder's work environment from the cases HMIN cites as support.  [*See, e.g.*, Filing No. 46 at 16 ("The Seventh Circuit has squarely ruled that it 'will not find a hostile work environment for mere offensive conduct that is isolated

---

[2] The Court has censored the graffiti for purposes of this opinion, but the actual graffiti at the HMIN plant was not.

and does not interfere with the plaintiff's work performance, *and is not physically threatening* or

humiliating.'") (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011)

(emphasis added); Filing No. 46 at 18 (noting that to determine whether conduct is sufficiently

severe or pervasive to alter the terms and conditions of employment, courts look to various things

including "its frequency" and "whether it is physically threatening") (citing *Scruggs v. Garst Seed

Co.*, 587 F.3d 832, 840-41 (7th Cir. 2009)).]

      The Court finds it immaterial that the graffiti did not specifically mention Mr. Holder,

given that he is African American and the violent graffiti was directed at all African American

HMIN employees.  Likewise, the Court rejects HMIN's argument that Mr. Holder cannot prevail

on his hostile work environment claim as a matter of law simply because at least some of his

exposure was part of his job duties.  [Filing No. 46 at 16-18.]  HMIN cites no caselaw for that

point, and such a rule would unfairly exclude employees in sensitive investigation or human

resources roles simply based on the nature of their positions.  Given that the offensive graffiti

occurred repeatedly for almost a year and frequently threatened physical violence, the Court cannot

conclude as a matter of law that the harassment was not so severe or pervasive as to alter the

conditions of Mr. Holder's work environment.

      The Court does conclude as a matter of law, however, that HMIN is entitled to summary

judgment on Mr. Holder's hostile work environment claim based on the offensive graffiti because

Mr. Holder has not presented evidence of employer liability.  Mr. Holder confirms that he is not

asserting vicarious liability for any acts of his supervisors.  [Filing No. 49 at 10-11.]  Thus, HMIN

is only liable for the harassment "if it was negligent in its response to the harassment." *Chaib*, 744

F.3d at 985.  An employee must present evidence that the employer "failed to take reasonable steps

to remedy the harassment once" it was on notice of the employee's complaint. *Wyninger v. New*

*Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004) (citing *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2011)).  If the employer takes reasonable steps to discover and rectify the harassment, the employer has satisfied its legal duty.  *Baskerville*, 50 F.3d at 431–32.

Mr. Holder has not presented evidence creating a genuine issue of material fact with regard to employer liability for two reasons.  First, it is undisputed that Mr. Holder never told his supervisors or anyone in management that he was uncomfortable with his job assignment or no longer wanted to be part of the graffiti investigation team.  [Filing No. 45-1 at 63; Filing No. 45-1 at 73.]  In other words, although HMIN was aware of the offensive graffiti, it is undisputed that Mr. Holder never notified a supervisor of his discomfort or asked to be reassigned, which would have given HMIN an awareness that he perceived the workplace as hostile to him and an opportunity to take remedial action.  *See Chaib*, 744 F.3d at 986 (holding that a corrections officer who "presented no evidence that her employer was aware of any threat greater than that inherent to the position" could not show employer liability sufficient to survive summary judgment); *see also Romaniszak-Sanchez v. Int'l Union of Operating Engineers, Local 150*, 121 F. App'x 140, 146 (7th Cir. 2005) ("She never complained to her supervisors. . . . Notice or knowledge of the harassment is a prerequisite for liability.").  Accordingly, HMIN is entitled to judgment on Mr. Holder's claim based on the graffiti.

Second, Mr. Holder has not presented evidence sufficient to create an issue of material fact that HMIN was negligent in response to the graffiti.  *See Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) ("[T]he employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.").  Prompt investigation is "a hallmark of reasonable corrective action."  *Id.*  On the other hand, an employer's absence of remedial actions, such as failing to investigate or

allowing offensive graffiti of which it is aware to remain, may subject it to liability for a hostile work environment. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1275 (7th Cir. 1991) (affirming district court's award in favor of plaintiff following bench trial due in part to employer's "completely ineffective response to racially discriminatory incidents" that included graffiti).

It is undisputed that in response to the offensive graffiti, HMIN promptly removed it within 30 to 60 minutes, patrolled the bathroom every 30 minutes, and installed a camera that it later had to remove after it was discovered. [Filing No. 45-1 at 78; Filing No. 45-1 at 83-85; Filing No. 45-2 at 3-4; Filing No. 50-1 at 2.] The only additional thing Mr. Holder identifies on summary judgment that HMIN could have done was to put up an additional camera. [Filing No. 49 at 10.] Mr. Holder points out that although he and his supervisor agreed that Mr. Holder's suggestions of an additional camera would be a good idea, several weeks after the recommendation it "still had not been implemented." [Filing No. 49 at 10.] In his deposition, however, Mr. Holder confirmed that a facilities manager was in charge of installing the camera and that because Mr. Holder went on leave shortly thereafter, he was not actually sure whether it was installed but assumed it had not been. [Filing No. 45-1 at 91-92.] Even assuming that HMIN did not follow through with Mr. Holder's suggestion to install an additional camera, the Court concludes that this does not create an issue of material fact regarding the reasonableness of HMIN's overall response to the graffiti, especially because Mr. Holder admits that a camera that was previously installed had to be removed after employees discovered it. [Filing No. 45-1 at 84-85.] With the exception of one incident in October 2013, no graffiti appeared after April 2013. [Filing No. 45-3 at 3.] Thus, HMIN's remedial actions ultimately worked, which demonstrates their reasonableness.

Although a reasonable jury may well find that the graffiti at the HMIN plant was utterly deplorable such that it may have created a hostile work environment, for the reasons stated herein,

the Court concludes that Mr. Holder has failed to present evidence creating an issue of material fact regarding employer liability.  Thus, HMIN is entitled to summary judgment as a matter of law on Mr. Holder's hostile work environment claim based on the graffiti issue.

### C. Allegedly Discriminatory Treatment of Others[3]

HMIN also seeks summary judgment on Mr. Holder's hostile work environment claim based on discriminatory treatment he alleges other minority HMIN employees received.  [Filing No. 46 at 22-27.]  It emphasizes that the merits of unrelated employment actions are not before the Court and that the people allegedly impacted by those situations are not parties to this lawsuit.  [Filing No. 46 at 22.]  HMIN contends that Mr. Holder cannot succeed on a theory of "second-hand harassment" because Mr. Holder had no involvement with the situations he cites, they did not alter the terms and conditions of his employment, and the alleged events are insufficient to support a hostile work environment claim.  [Filing No. 46 at 23-26.]  HMIN emphasizes that its research located no Seventh Circuit case where an actionable hostile work environment claim was based solely on the alleged mistreatment of others.  [Filing No. 24.]  Finally, HMIN reemphasizes the absence of evidence to support employer liability.

In response, Mr. Holder designates evidence that he believes shows a "disturbing pattern" of discrimination at HMIN.  [Filing No. 49 at 11-13.]  He contends that this alleged pattern subjected him to a hostile work environment even though he was not an employee directly involved in the allegedly discriminatory treatment.  [Filing No. 49 at 12.]  With respect to proof of the employer liability element, Mr. Holder claims it is irrelevant that he has not identified a supervisor

---

[3] HMIN asks the Court to strike evidence that Mr. Holder designated in opposition to summary judgment on his claim based on the allegedly discriminatory treatment of others.  [Filing No. 59 (asking to strike Filing No. 50-7 through Filing No. 50-12).]  Because Mr. Holder's claim fails as a matter of law even if the Court considers that evidence, the Court denies HMIN's Motion to Strike as moot.  [Filing No. 59.]

because he is "not making a claim of vicarious liability based upon a statement of a supervisor." [Filing No. 49 at 12-13.]

In its reply, HMIN again emphasizes the standard for a hostile work environment claim, contending that the situations Mr. Holder cites come nowhere near that standard. [Filing No. 58 at 16-17.] HMIN again emphasizes that Mr. Holder has not shown how these incidents impacted him and caused his work environment to be hostile. [Filing No. 58 at 17.]

To succeed on a hostile work environment claim, a plaintiff must show how the employee's work environment was both subjectively and objectively hostile. *Smith*, 388 F.3d at 566. There is no hostile work environment where the harassment about which the employee complains was not directed at the employee. *Id.* at 567 ("There is no hostile work environment where as here, the harassment about which Weaver complains was not directed at her."). While harassment directed at someone other than the plaintiff can be relevant, "the impact of such second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." *Id.* A plaintiff can still demonstrate a hostile work environment through second-hand comments or situations where the plaintiff is not the intended target, but the plaintiff still must show that what he "personally experienced" amounted to an objectively hostile work environment. *Id.*

"The more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that the worker's working environment was actually made unbearable, as the worker claims." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555-56 (7th Cir. 2007). "Offense based purely on hearsay or rumor really is 'second hand;' it is less credible, and, for that reason and also because it is less confrontational, it is less wounding than offense based on hearing or seeing . . . and it is also more difficult for the employer to control." *Id.*

Even construing the evidence in a light most favorable to Mr. Holder, his hostile work environment claim based on the allegedly discriminatory treatment of other HMIN workers fails as a matter of law.  In his opposition to summary judgment, Mr. Holder summarizes the allegedly discriminatory situations as follows:

> One white employee was promoted over an African American employee who was ineligible for the position.  Several white employees were treated differently than an African American employee who were all accused of harassment.  One African American employee was demoted despite performing her job expectations and similar situated employees being treated differently.  Several employees who made racial slurs who should have been terminated were not.

[Filing No. 49 at 12.]  Mr. Holder admits that he did not personally witness any of these situations.  [Filing No. 45-1 at 150-51.]  Mr. Holder was involved with the investigation of two of them in his role as an AR associate, but not the others.  [Filing No. 45-1 at 151.]  Mr. Holder admits that he looked at some of the files because he was curious to see what happened, not because he had been tasked with doing so.  [Filing No. 45-1 at 23; Filing No. 45-1 at 128 ("I looked into the files later, yes, ma'am . . . . Just curious to see how it was handled."); Filing No. 45-1 at 136-37; Filing No. 45-1 at 291 (Q: "That was part of your job?  A. In that case [I] was curious.  I wanted to see if that issue was an actual fact or was it something that – or was it a rumor.").]

The Court agrees with HMIN that the merits of the employment situations that did not involve Mr. Holder are not at issue in this litigation.  Instead, to succeed on his hostile work environment claim, Mr. Holder must show how the cited situations resulted in harassment so severe or pervasive as to alter Mr. Holder's own conditions of employment and create an abusive working environment for Mr. Holder.  *Smith*, 388 F.3d at 566; *see also Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002) (noting that for a hostile work environment claim, the "harassment must be so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment").  In response to HMIN's motion for summary

17

judgment, Mr. Holder does not argue, much less cite evidence, that the situations he identifies altered his own employment conditions at HMIN. [Filing No. 49 at 11-13.]

Mr. Holder's admissions that he did not personally witness any of the cited situations and that he exposed himself to some of them by reviewing files to satisfy his own curiosity, [Filing No. 45-1 at 150-51; Filing No. 45-1 at 23; Filing No. 45-1 at 128; Filing No. 45-1 at 136-137; Filing No. 45-1 at 291], significantly diminishes any impact on Mr. Holder's work environment, *Yuknis*, 481 F.3d at 555-56. What remains is Mr. Holder's deposition testimony that he had no complaints regarding how he was treated by his supervisor Ms. Stille-Jackson or any of his co-workers in the AR department. [Filing No. 45-1 at 36-37.] And although Mr. Holder testified that supervisor Ms. Fortkamp treated him "differently," he admitted that he could not say it was because of his race. [Filing No. 45-1 at 208]; *see Smith*, 388 F.3d at 566 (holding that to survive summary judgment on a hostile work environment claim, one of the things the employee must show is he was subjected to harassment based on his race).

Yet Mr. Holder does not assert supervisor conduct as a basis of liability for HMIN. Nor does Mr. Holder present evidence that he notified anyone at HMIN of any adverse effect caused by the treatment of others on his own conditions of employment. Absent such notice, HMIN had no opportunity to respond. HMIN therefore cannot be subject to employer liability for the allegedly hostile work environment that Mr. Holder claims to have experienced. *See Chaib*, 744 F.3d at 986; *see also Romaniszak-Sanchez*, 121 F. App'x at 146.

For all of these reasons, the Court concludes that HMIN is entitled to summary judgment on Mr. Holder's hostile work environment claim based on the allegedly discriminatory treatment of other HMIN employees.

### D. Combination Claim

In his statement of claims, Mr. Holder listed a third hostile work environment claim "based on a combination of the graffiti and the differential and unconscionable treatment." [Filing No. 44 at 2.] The parties did not separately brief this claim on summary judgment, but HMIN moves for summary judgment on all of Mr. Holder's claims and in his response brief, Mr. Holder cited the combination of his circumstances in conjunction with his claim regarding the allegedly discriminatory treatment of some of his co-workers. [Filing No. 49 at 12 (arguing that the "combination of discriminatory treatment of other employees as well as the graffiti" exceeded cases in which summary judgment had been granted to an employer).]

The Court concludes as a matter of law that the reasons it cited for granting summary judgment on Mr. Holder's offensive graffiti claim and his allegedly discriminatory treatment of co-workers claim also result in summary judgment in favor of HMIN on a combination claim. For example, the Court concluded with Mr. Holder's prior claims that there is no evidence that he notified a supervisor of either situation as it pertained to him, such that HMIN would be subject to employer liability for the allegedly hostile work environment to which Mr. Holder claims he was subjected. Given that the Court has concluded that Mr. Holder has not presented evidence of employer liability to survive summary judgment on the individual claims he makes, the hostile work environment claim he makes based on a combination of those situations also fails as a matter of law.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** HMIN's Motion for Summary Judgment. [Filing No. 45.] HMIN's Motion to Strike is **DENIED AS MOOT**. [Filing No. 59.] Final judgment shall issue accordingly.

Date: 7/17/2015

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Electronic Distribution via CM/ECF:**

Brian R. Garrison
FAEGRE BAKER DANIELS LLP - Indianapolis
brian.garrison@faegrebd.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Sarah E. Caldwell
FAEGRE BAKER DANIELS LLP - Indianapolis
sarah.caldwell@faegrebd.com

Adam Lenkowsky
ROBERTS & BISHOP
alenkowsky@roberts-bishop.com